2022 IL App (2d) 210452-U
No. 2-21-0452
Order filed July 11, 2022

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(l).

_____

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

_____

| | | |
|---|---|---|
| BLACKHAWK BUILDING, LLC, | ) ) | Appeal from the Circuit Court of Kane County. |
|     Plaintiff-Appellant and Cross-Appellee, | ) ) ) | |
| v. | ) ) ) | No. 18-L-140 |
| JOSEPH A. STANTON, ROBERT DI PASQUANTONIO, JEANETTE DI PASQUANTONIO, and EAT RESTAURANT GROUP, INC., | ) ) ) ) ) | |
|     Defendants | ) ) | Honorable |
| (Joseph A. Stanton, Defendant-Appellee and Cross-Appellant). | ) ) | Mark A. Pheanis Judge, Presiding. |

_____

       JUSTICE JORGENSEN delivered the judgment of the court.
       Justices McLaren and Schostok concurred in the judgment.

**ORDER**

¶ 1    *Held*: We dismiss in part plaintiff's appeal and dismiss defendant's cross-appeal, concluding the parties in part seek review of nonfinal orders. Otherwise, we reverse the circuit court's grant of summary judgment in favor of defendant on plaintiff's breach-of-contract claim and remand for further proceedings.

¶ 2    Plaintiff, Blackhawk Building, LLC (Blackhawk), sued defendants, Joseph A. Stanton (Stanton), Robert Di Pasquantonio, Jeanette Di Pasquantonio, and EAT Restaurant Group, Inc.

(EAT), asserting claims of fraudulent inducement and breach of contract arising out of Blackhawk's purchase from Stanton of a commercial property in Geneva.[1] As to Stanton, the complaint, as later amended, sought recission of the contract based on fraudulent inducement (count I) and mistake of fact (count II) and money damages based on fraudulent inducement (count III) and breach of contract (count IV). Stanton raised three affirmative defenses, which he claimed barred all of Blackhawk's claims: (1) the claims were time barred by a one-year contractual limitations period; (2) the claims were barred by an "integration/no-reliance" clause in the purchase contract; and (3) Blackhawk failed to mitigate its damages.

¶ 3    Blackhawk and Stanton each filed motions for summary judgment. (The motions were partially cross-motions for summary judgment.) Blackhawk sought partial summary judgment on the issue of liability on counts I, III, and IV of its amended complaint. It also sought summary judgment on all of Stanton's affirmative defenses. Stanton sought judgment in his favor on his first (contractual limitations) and second (integration/no-reliance clause) affirmative defenses, arguing those defenses barred all four counts of Blackhawk's amended complaint.

¶ 4    On February 8, 2011, the circuit court granted in part the parties' motions. Specifically, the court entered judgment in favor of Stanton on count IV,[2] finding the claim was untimely under the contractual limitations provision, and in favor of Blackhawk on Stanton's second affirmative defense. The court denied Blackhawk's motion insofar as it sought a finding of liability on counts

---

[1]The Di Pasquantonios and EAT are not parties to this appeal.

[2]As we will later explain, the court's oral ruling appears to conflict with the written order that was later entered, and we conclude the circuit court only entered judgment on count IV of Blackhawk's amended complaint.

I and III and judgment on Stanton's third affirmative defense (failure to mitigate damages) and denied Stanton's motion as to count II of the amended complaint.

¶ 5 Blackhawk and Stanton have cross-appealed from this order under Illinois Supreme Court Rule 304(a) (eff. Mar. 8, 2016). For the following reasons, we dismiss in part Blackhawk's appeal and dismiss in its entirety Stanton's cross-appeal. Otherwise, we reverse and remand for further proceedings.

¶ 6                                    I. BACKGROUND

¶ 7                          A. The Property and EAT's Tenancy

¶ 8 Stanton owned the property at issue and on it built a multiunit commercial building, which he leased to various businesses. Beginning in December 2006, EAT, which was owned by the Di Pasquantonios, leased from Stanton and operated the Urban Grille restaurant in one of the units. (The Di Pasquantonios personally guaranteed the lease.) In January 2011, Stanton and EAT extended the lease, effective December 1, 2011, to November 30, 2018. In relevant part, the lease required EAT to pay Stanton rent on the first day of each month. The lease contained a variable rent schedule, under which the monthly rent was $17,500 in October and November 2013 and increased to $17,850 per month in December 2013. The lease also defined what constituted a default: in pertinent part, a default included "[t]he failure of [EAT] to pay an installment of Rent when due," where "such failure continue[d] for [10] days after written notice thereof by [Stanton] to [EAT]."

¶ 9 At some point before November 2013, Stanton decided to sell the property. He hired Jake Finley to broker the sale.

¶ 10                                   B. The Contract

¶ 11 On November 21, 2013, Blackhawk, which was owned by David and Susan Wagenaar,

and Stanton agreed to terms. Blackhawk agreed to purchase the property for $4,100,000. (The sale price was later reduced to $3,975,000.) Blackhawk also agreed to purchase (and Stanton agreed to assign to Blackhawk) all leases that were then in effect at the property, including EAT's lease. They signed a "Purchase Sale Agreement" (contract) reflecting their agreement.

¶ 12    Under paragraph 4 of the contract, Stanton was required to deliver to Blackhawk certain due-diligence materials and allow Blackhawk access to his books and records relating to the property. Blackhawk retained the right to terminate the contract for any reason for 45 days after the materials were delivered.

¶ 13    Paragraph 5 of the contract stated, in pertinent part, as follows:

"5. Conditions Precedent to Closing

(a) The following are conditions to closing for [Blackhawk's] benefit, unless they are waived by [Blackhawk] *** in writing prior to Closing: (i) [Stanton] shall not be in default of any *** covenant or obligation under this [contract], (ii) all of [Stanton's] representations and warranties set forth in this Agreement shall remain true and correct in all respects as of the Closing Date, *** (v) [Stanton] shall obtain an estoppel certificate dated within ten (10) days of Closing (the "Tenant Estoppel Certificate") *** from each tenant under every Lease in a form reasonably acceptable to [Blackhawk] and [Blackhawk's] lender disclosing no material defaults thereunder and no terms which are materially different from Leases delivered to [Blackhawk].

(b) Upon failure of any of the foregoing conditions precedent, [Blackhawk] may terminate this [contract] and [Blackhawk] shall be entitled to a return of the Deposit and all obligations under this [contract] shall terminate. Notwithstanding the foregoing, if a condition precedent to [Blackhawk's] obligations to close shall fail by virtue of a default

by [Stanton] of an express obligation under this [contract], then [Blackhawk] reserves its rights on account of such default.

 (c) As used herein, the term [']Material Adverse Change['] shall mean an adverse change in the Property, the income generated or to be generated from the Property and/or the expenses to be incurred in operating the Property, including (without limitation) if any of the followings occurs with respect to any single tenant or group of tenants comprising at least 10% of either the occupied space of the Property or the gross rent of the Property: (i) ceasing operation from the Property ***; (ii) monetary default under or termination of their respective Leases[;] (iii) the announcement that it shall be closing its store at the Property or that it has or intends to file for bankruptcy; or (iv) a material adverse change in the credit worthiness of such tenant(s). Any announcement shall be based upon correspondence or an announcement from such tenant or an otherwise credible or verifiable source including media announcements."

Paragraph 5(d) provided, in pertinent part, that the failure of any of the foregoing conditions precedent entitled Blackhawk, at its option, to terminate the contract without liability.

¶ 14 Paragraph 7(a) required the parties to prorate "all rents *** collected prior to the Closing and applicable to periods after the Closing." However, rents that were past due as of the closing were not to be prorated.

¶ 15 Paragraph 9 of the contract stated as follows:

 "Seller Representations and Warranties. [Stanton] makes the following representations and warranties as of [November 21, 2013,] and again as of [January 16, 2014,] as follows (and all of which shall survive the Closing for a period of [12] months (the [']Survival Period[']) and not be merged into the Deed):

\*\*\*

(c) As of [November 21, 2013], the only Leases in effect with respect to the Property are those leases described on the rent roll attached hereto as EXHIBIT C and such rent roll is true and correct in all material respects. There is no default on the part of [Stanton] as landlord under the Leases and the Leases are is [*sic*] in full force and effect. To [Stanton's] knowledge, there is no default on the part of the tenants under the Leases. [Stanton] has delivered a true and correct copies [*sic*] of the Leases to [Blackhawk]."

¶ 16 Paragraph 10 provided that, after closing, Blackhawk had

"the right to bring any action against [Stanton] as a result of any untruth or inaccuracy of representations and warranties made herein if (i) such untruth or inaccuracy is material, and (ii) prior to Closing[,] [Blackhawk] did not discover or learn information (from whatever source) that contradicts any such representations and warranties, or renders any such representations and warranties untrue or incorrect."

¶ 17 Paragraph 18(c) stated as follows:

"This [contract] constitutes the entire agreement of [Blackhawk] and [Stanton] with respect to the purchase and sale of the Property, is intended to be an integration of all prior negotiations and understandings[,] and supersedes any prior or contemporaneous agreement with respect thereto. [Blackhawk], [Stanton,] and their agents shall not be bound by any terms, conditions, statements, warranties[,] or representations, oral or written, not contained herein."

¶ 18 Paragraph 18(g) stated the contract and the rights of the parties were "governed by and construed in accordance with the laws and customs of the State of Illinois."

¶ 19                    C. The Period Leading to the Closing

¶ 20    After the parties signed the contract, Stanton delivered to Blackhawk certain due-diligence materials pursuant to paragraph 4 of the contract. On December 5, 2013, Stanton delivered income statements that showed Stanton's purported annual receipts from his tenants. It showed, in 2013, Stanton received $204,100 in rental income from the Urban Grille. (The annual rent due under EAT's lease was $204,350, a difference of $250.)

¶ 21    A few days before the closing, David observed a sign on the door of the Urban Grille that stated, "Closed for the month of January." He also observed that the restaurant was not operating that day but that the utilities were on and the furnishings were in place. Blackhawk inquired with Finley about the sign and was told that it was EAT's normal practice to close in January. In his answer to the amended complaint, Stanton admitted that he was asked by Finley about the sign and advised him that EAT had on occasion closed the Urban Grille at certain times in previous Januarys.

¶ 22    On January 15, 2014, Robert, as president of EAT, signed a "tenant estoppel certificate" as required by paragraph 5(a) of the contract. Stanton helped obtain Robert's signature on the certificate but later denied that he prepared it. In the certificate, EAT represented, in pertinent part, that it was current on rent through January 2014 and was "open for business and in operation in the Premises." Additionally, EAT represented it understood that Blackhawk was financing the purchase and that Blackhawk's lender was relying on the representations and warranties contained in the certificate.

¶ 23                              D. The Closing

¶ 24    The sale closed on January 16, 2014. At the closing, pursuant to paragraph 7(a) of the contract, Blackhawk received a $17,257.82 credit against the purchase price, which was a proration

of the rent Stanton purportedly received in January 2014. The proration included $8,925 from the January rent purportedly collected from EAT.

¶ 25         E. EAT Permanently Closes the Urban Grille and Files Bankruptcy

¶ 26    EAT never resumed its operations after the closing. On February 1, 2014, it informed Blackhawk it had permanently closed the Urban Grille. On February 4, 2014, Robert emailed David "to explain [his] current situation." Robert stated that EAT had "every intention" of reopening the Urban Grille in February. He explained, however, he had been diagnosed with degenerative cervical spine disease and, in January 2014, he was in a head-on collision that "made [his] situation much worse," rendering him unable to be an active part of the restaurant. Thus, the Di Pasquantonios had decided to try to sell the Urban Grille. That same day, Blackhawk served on EAT a 10-day notice pursuant to the lease. On February 25, 2014, Blackhawk commenced forcible entry and detainer proceedings (Kane County case No. 14-LM-326) and later obtained a money judgment and order of possession.

¶ 27    On August 25, 2014, the Di Pasquantonios petitioned for relief under Chapter 7 of the United States Bankruptcy Code (11 U.S.C. § 701 *et seq.* (2012)).[3] As part of their filing, the Di Pasquantonios listed Blackhawk as a creditor. They did not list Stanton.

¶ 28    On April 2, 2015, the Di Pasquantonios sat for a Rule 2004 examination (Fed. R. Bankr. P. 2004 (eff. Dec. 1, 2002)). During the examination, Robert maintained EAT had paid all rent due

---

[3]The Di Pasquantonios twice petitioned under Chapter 7, first on August 25, 2014, and again on June 14, 2017. For reasons not apparent in the record, the first bankruptcy petition was dismissed.

to Stanton through January 2014. Robert testified the Urban Grille was having difficulties in 2013. It was not making money. However, it always paid full rent, even if late or in multiple payments.

¶ 29    Robert also testified that, beginning in "probably" 2010 or 2011, it was their normal practice to close in January and Stanton knew this. Robert explained, "with business *** it was better to close [in January] and open after the Superbowl." Jeanette could not recall whether the Urban Grille was open in January 2011, 2012, or 2013.

¶ 30    Robert also explained he signed the tenant estoppel certificate, which stated EAT was "open for business and operating," because EAT intended to reopen. At the time, EAT was current on its rent. However, in light of his medical condition and EAT's inability to afford a manager, EAT decided to close. Asked whether his neck condition had been diagnosed before he signed the certificate, Robert answered, "I think so," but he could not be sure. And, when asked when EAT made the decision to close, he responded, "December January time frame." At no time did he tell Stanton about his neck problems "because [it was] not [Stanton's] business."

¶ 31    About a year later, in January or April 2016, Blackhawk received EAT's bank records. It was at this time that Blackhawk learned EAT paid no rent to Stanton after a partial payment in October 2013. Those records also showed that EAT had a steady flow of deposits and withdrawals throughout the months of January 2011, 2012, and 2013. All other records of EAT's operation of the Urban Grille were maintained electronically but were either lost or destroyed before the Rule 2004 examination.

¶ 32            F. Blackhawk Sues Stanton, EAT, and the Di Pasquantonios

¶ 33    On March 9, 2018, Blackhawk sued Stanton, EAT, and the Di Pasquantonios. On Stanton's motion, the court dismissed the original complaint, as it related to Stanton, without prejudice, on the basis that it was not timely under a one-year limitations period in the contract. Thus, on

September 26, 2018, Blackhawk amended its complaint. It asserted four claims against Stanton: (1) recission based on fraudulent inducement (count I); (2) recission based on a mistake of fact (count II); (3) fraudulent inducement, seeking money damages (count III); and (4) breach of contract, seeking money damages (count IV). To avoid the one-year limitations period, Blackhawk alleged Stanton fraudulently concealed Blackhawk's causes of action, which, under section 13-215 of the Code of Civil Procedure (Code) (735 ILCS 5/13-215 (West 2018)), meant it had five years, after discovering the causes of action, to bring its claims.

¶ 34    Stated succinctly, in its amended complaint, Blackhawk alleged that EAT accounted for approximately 40% of the building's rental income. Before October 2013, EAT began suffering a significant decrease in business and income. It paid partial rent in October 2013 and then told Stanton it intended to cease operations. Anticipating the sale of the property and that the loss of EAT's tenancy would negatively affect its value, Stanton entered into an agreement with EAT to hide EAT's intent to close from Blackhawk and represent falsely that EAT was a going concern[4] and current on its rental payments. As part of that agreement, Stanton agreed to allow EAT to continue operating without paying rent until the sale closed and forgave EAT's past-due and future rent. In return, EAT agreed to present itself as a going concern, by, among other things, continuing operations through December 2013, executing the tenant estoppel certificate, and representing that it had closed in prior Januarys.

¶ 35    Blackhawk also alleged Stanton, to induce Blackhawk to enter the contract, made the following material misrepresentations: (1) representing, in paragraph 9 of the contract, "there

_____

[4]A "going concern" is "[a] commercial enterprise actively engaging in business with the expectation of indefinite continuance." Black's Law Dictionary 835 (11th ed. 2019).

[wa]s no default on the part of the tenants under the Leases" assigned to Blackhawk, thereby implying EAT had paid all rents due under the lease; (2) preparing and obtaining Robert's signature on the estoppel certificate and delivering it to Blackhawk, thereby representing that EAT was current in its rental payments; (3) representing that EAT's closure in January 2014 of the Urban Grille was temporary and that it had regularly closed in prior Januarys due to decreased business and vacations; and (4) representing that EAT was a going concern and paying tenant. In relation to counts I and III, Blackhawk alleged Stanton knew those representations were false when he made them. In relation to count II, Blackhawk alleged that, even if Stanton did not know the representations were false, they were mistakes of fact justifying recission. In relation to count IV, Blackhawk alleged the misrepresentations constituted material breaches under paragraph 10 of the contract.

¶ 36    Stanton moved to dismiss the amended complaint (735 ILCS 5/2-619.1 (West 2018)). He again argued the complaint was barred by the contractual limitations period notwithstanding Blackhawk's reliance on section 13-215 of the Code. Additionally, Stanton argued that an integration/no-reliance clause in the contract barred Blackhawk's claims. The court denied the motion.

¶ 37                  G. Stanton's Answer and Affirmative Defenses

¶ 38    Stanton answered the complaint and asserted three affirmative defenses. First, Stanton asserted a one-year contractual limitation period, contained in paragraph 9(c) of the contract, barred Blackhawk's claims. Second, he contended paragraph 18(c) of the contract was an integration/no-reliance clause that barred Blackhawk's claims, because those claims were "based on extra-contractual statements, representations[,] and warranties not contained in the [contract]." Third, he contended Blackhawk failed to mitigate its damages.

¶ 39                    H. Motions for Summary Judgment

¶ 40    Blackhawk and Stanton each moved for summary judgment (735 ILCS 5/2-1005 (West 2020)), attaching various materials, including affidavits, deposition transcripts, the transcript of the Di Pasquantonios' Rule 2004 examination, and other documentary evidence. In its motion, Blackhawk sought partial summary judgment on counts I, III, and IV of its amended complaint, more specifically, for a finding that Stanton was liable on those claims, and asked the court to set the matter for a trial on damages. Blackhawk also sought judgment in its favor on all three of Stanton's affirmative defenses. In his motion, Stanton sought summary judgment on all counts of the amended complaint, arguing his first (contractual limitations) and second (integration/no-reliance clause) affirmative defenses barred the claims.

¶ 41    The materials attached to the parties' motions demonstrated that, until October 2013, EAT generally paid full rent each month, though sometimes it was late or made in parts. Days before his deposition, in November 2019, Stanton produced copies of checks that he had received from EAT. Those checks were dated October 1, November 1, and December 1, 2013, were written for the full amount of rent due those months, and, on the memo line, stated they were for October, November, and December 2013 rents, respectively. At his deposition, Stanton testified that he never attempted to deposit those checks because EAT did not have sufficient funds. Stanton explained, "back then, you could call the bank and ask if a check would be good ***. So, we just checked everyday and they were never good and eventually the account was closed." Nevertheless, Stanton did not believe EAT had defaulted under the lease, explaining it was not "unusual for us to sit on checks for tenants. We would call the bank and when there was money in there, we would deposit them." He believed the checks would eventually clear but never told Blackhawk he had not yet deposited them because there were insufficient funds in EAT's account. In her affidavit,

Susan averred EAT had sufficient funds to cover at least one of the checks on 12 days in December 2013. A "deposit detail" that Stanton produced in the litigation confirmed that Stanton did not make any deposits of EAT's rent after an October 1, 2013, deposit of $9000.

¶ 42   In David's deposition, he testified that he did not know EAT had made false representations in the tenant estoppel certificate until, at the earliest, the Di Pasquantonios sat for their Rule 2004 examination. About a year later, when Blackhawk received EAT's bank records, it confirmed EAT had not paid any rent to Stanton after a partial payment in October 2013. In her affidavit, Susan agreed with this statement, averring that Blackhawk "first learned that EAT had not paid Stanton rent since October[ ] 2013 *** when it received EAT's the checks [*sic*] from [EAT's] bank records in April[ ] 2016."

¶ 43   David acknowledged paragraph 10 of the contract gave Blackhawk the right to bring an action based on the untruth or inaccuracy of any representation or warranty in the contract and agreed Blackhawk should be held to the agreement.

¶ 44   In his deposition, Stanton was asked whether Blackhawk before closing did not fail to request any documents that it should have. He responded, "I can't think of anything, no. They were probably more thorough than anybody I have ever done business with."

¶ 45   Blackhawk attached to its motion an affidavit from Steven Niedholdt, a remodeling contractor who had previously done work at the property. He averred that, in November 2013, he was in Stanton's office at the property. At that time, Robert came into the office and told Stanton he intended to permanently close the Urban Grille because he had severely injured his back in a car accident and was unable to work. Stanton told Robert that, because he had listed the property for sale, he needed Robert to keep Urban Grille open until the sale closed. Robert agreed. In his affidavit, Stanton denied that Niedholdt was ever on the premises in November 2013 and that this

conversation ever took place. He also denied that he and EAT had entered into any agreement for the purpose of defrauding Blackhawk.

¶ 46 As to Stanton's first affirmative defense (contractual limitations period), Blackhawk argued paragraph 9 restricted the application of the one-year limitations period only to claims that were based on Stanton's representation, contained in paragraph 9(c), that to his knowledge the rent roll attached to the contract was true and correct and that none of his tenants had defaulted on any of the leases that were to be assigned to Blackhawk. According to Blackhawk, its claims were not entirely based on that representation. Further, it argued that, even if paragraph 9(c) applied, Stanton and EAT, pursuant to an agreement, engaged in a scheme to conceal the causes of action, and, therefore, it was entitled, under section 13-215 of the Code, to bring its claims within five years of the date it discovered them. Blackhawk asserted it did not discover the claims until April 2016, when it received checks from EAT's bank records showing EAT had not paid rent to Stanton after October 2013. Because it brought its claims in March 2018, less than two years after it discovered its causes of action, the claims were timely.

¶ 47 Stanton responded that, because Blackhawk's allegations of concealment merely repeated the underlying allegations of fraud, section 13-215 was inapplicable. Additionally, he argued that Blackhawk, according to David, discovered its causes of action no later than the Di Pasquantonios' Rule 2004 examination on April 2, 2015, and was required to bring its claims within one year of that date, or by April 2, 2016. But instead, Blackhawk filed suit in March 2018, rendering its claims untimely.

¶ 48 At the hearing on the motion, Blackhawk argued, on the issue of fraudulent concealment, that the court should not find in favor of Stanton on the contractual limitations period, because there existed questions of fact as to whether Stanton fraudulently concealed the causes of action.

¶ 49          I. The Trial Court's Ruling and Subsequent Proceedings

¶ 50    The circuit court granted in part and denied in part the motions. Specifically, the court entered judgment in favor of Stanton on count IV of the amended complaint, finding the contractual-limitations provision barred that claim. The court entered judgment in favor of Blackhawk on Stanton's second affirmative defense (integration/no-reliance clause), finding paragraph 18(c) of the contract was an integration clause and not also a no-reliance clause. The court denied both parties' motions as they pertained to counts I and III of the amended complaint (the claims based on fraud) and denied Blackhawk's motion as it pertained to Stanton's third affirmative defense (failure to mitigate damages). In its oral ruling, the court did not specifically address count II, which sought recission based on a mistake of fact. However, the court stated, "I think the breach of contract claim is gone. I think the fraud case or cases live."

¶ 51    Thereafter, the parties agreed on the language of a written order and submitted it to the court. The entered the written order, which read as follows:

"1. Plaintiff's Motion for Summary Judgment is denied for the reasons stated on the record.

2. Defendant's Motion for Summary Judgment is granted with respect to Count II (Recission-Mistake) and Count IV (Breach of Contract) for the reasons stated on the record.

3. Defendant's Motion for Summary Judgment is denied with respect to Count I (Recission-Fraud) and Count III (Fraud), for the reasons stated on the record.

4. The matter remains set for Zoom status hearing on [March 4, 2021,] at 9:00 a.m."

¶ 52    Stanton moved for a finding, under Rule 304(a) (Ill. S. Ct. R. 304(a) (eff. Mar. 8, 2016)), that there was no just reason for delaying the enforcement, appeal, or both, of the court's order. The court granted the motion.

¶ 53    Thereafter, Blackhawk moved to reconsider the court's order on the summary judgment motions, specifically, its rulings as to counts II and IV of the amended complaint. Blackhawk argued paragraph 9(c) placed a one-year limitations period for claims that were based on Stanton's representation, contained therein, that to his knowledge, none of his tenants had defaulted on the terms of their leases. According to Blackhawk, its breach-of-contract claim was not based on this representation. Rather, that claim was based on Stanton's delivery of an inaccurate income statement, tenant estoppel certificate, and closing statement, his payment of prorated rent, and failure to disclose an adverse material change, all of which were duties placed on Stanton by other paragraphs of the complaint. It also asserted that implicit in the court's ruling was a determination that section 13-215 of the Code did not apply because Blackhawk had failed to meet its burden on that issue. Blackhawk maintained it had presented enough evidence to support a finding that Stanton fraudulently concealed the causes of action and, thus, summary judgment was improper.

¶ 54    The court denied the motion. With regard to section 13-215 of the Code, the court determined the statute "extends the *statutory* limitations period of any action five years, [but] it does not affect the right of the parties to contract for a shorter limitations period." (Emphasis in original.) This appeal followed.

¶ 55                                II. ANALYSIS

¶ 56    On appeal, Blackhawk contends the trial court erred by entering judgment in favor of Stanton on count IV of the amended complaint, because the contractual limitations period did not apply to the claim, and, even if it did, the claim was timely because Stanton fraudulently concealed

the cause of action. Blackhawk also contends the court erred by denying its motion insofar as it sought a finding that Stanton was liable on counts I, III, and IV and judgment on Stanton's third affirmative defense (failure to mitigate damages).

¶ 57    In his cross-appeal, Stanton contends that the circuit court erred by denying his motion for summary judgment as to counts I and III, arguing his first (contractual limitations period) and second (integration/no-reliance clause) affirmative defenses barred those claims.

¶ 58                                              A. The Parties' Briefs

¶ 59    Preliminarily, we note the parties' briefs contain some minor deficiencies. First, Blackhawk submitted a separate appendix with its brief, which includes some of the relevant pleadings and court orders. And, while the appendix includes a table of contents to the appendix, it is devoid of a table of contents to the record on appeal, which totals more than 900 pages. See Ill. S. Ct. R. 342 (eff. Oct. 1, 2019) (appendix must include a table of contents to the record on appeal). In addition, Blackhawk's statement of the case and its statement of the issues presented for review appear in single-spaced text. See Ill. S. Ct. R. 341(a) (eff. Oct. 1, 2020) (all text in a brief, except for headings and block quotations, must be double spaced). Finally, other than appellant's opening brief, the covers of the parties' briefs do not comply with the color requirements of Rule 341(d). See Ill. S. Ct. R. 341(d) (eff. Oct. 1, 2020) ("The colors of the covers of the documents, *whether electronic or paper*, shall be: appellant's brief \*\*\*, white; appellee's brief \*\*\*, light blue; appellant's reply brief, light yellow; reply brief of appellee, light red \*\*\*." (emphasis added)).

¶ 60    While these deficiencies are minor and are not sanctionable, they have nevertheless unnecessarily made our review more difficult. We remind counsel for both parties that we are

entitled to be presented with briefs that strictly comply with the supreme court rules governing their form and content. See *Litwin v. County of La Salle*, 2021 IL App (3d) 200410, ¶ 3.

¶ 61                                    B. Jurisdiction

¶ 62     We must assess whether we have jurisdiction over this appeal, whether in whole or in part. See *Secura Insurance Co. v. Illinois Farmers Insurance Co.*, 232 Ill. 2d 209, 213 (2009). "When jurisdiction is lacking, the court must dismiss the appeal on its own motion." *Almgren v. Rush-Presbyterian-St. Luke's Medical Center*, 162 Ill. 2d 205, 210 (1994).

¶ 63     Except when otherwise allowed by statute or rule, a reviewing court may only review *final judgments* that dispose of an entire action. *In re Marriage of Verdung*, 126 Ill. 2d 542, 553 (1989). Rule 304(a) permits a party to appeal an order that partially disposes of an action. It provides that, when multiple claims for relief are involved in an action, "an appeal may be taken from a *final judgment* as to one or more but fewer than all of the *** claims only if the trial court has made an express written finding that there is no just reason for delaying either enforcement or appeal or both." (Emphasis added.) Ill. S. Ct. R. 304(a) (eff. Mar. 8, 2016). Thus, when a party wishes to appeal an order under Rule 304(a), there are two prerequisites: (1) the order to be appealed must be a *final judgment* as to the claim, and (2) the court must make the requisite written finding. "A judgment or order is final for purposes of appeal if it disposes of the rights of the parties, either on the entire case or on some definite and separate part of the controversy, and, if affirmed, the only task remaining for the trial court is to proceed with execution of the judgment." *Brentine v. DaimlerChrysler Corp.*, 356 Ill. App. 3d 760, 765 (2005). The mere inclusion of the written finding, however, cannot make a nonfinal order immediately appealable. *In re Estate of Rosinski*, 2012 IL App (3d) 110942, ¶ 22.

¶ 64    Here, the parties have cross-appealed under Rule 304(a). There is no question the circuit court made the requisite written finding. Rather, the question is whether the February 8, 2021, order was a final judgment. More precisely, the question is whether any portions of that order were not final.

¶ 65    On appeal, Blackhawk contends, in part, the circuit court erred by denying its motion for summary judgment on counts I and III of its amended complaint. The circuit court, however, did not enter a final judgment on those claims. Rather, the court denied both parties' motions insofar as they related to count I and III, and those claims remain pending for further proceedings in the circuit court. Accordingly, we lack jurisdiction to consider Blackhawk's appeal insofar as it argues the circuit court should have granted summary judgment in its favor on counts I and III of the amended complaint.

¶ 66    We likewise conclude we lack jurisdiction to consider Blackhawk's contention that the circuit court should have granted summary judgment in its favor on Stanton's third affirmative defense (failure to mitigate damages). The parties did not file cross-motions on that claim—Blackhawk sought summary judgment in its favor, and Stanton did not—and the court found a dispute of material fact precluded entry of judgment on that claim. See 735 ILCS 5/2-1005(c) (West 2020) (a genuine issue of material fact as to any element of a claim precludes summary judgment). Again, no final judgment has been entered on that claim, and it likewise remains pending in the circuit court.

¶ 67    That brings us to another issue. There is a discrepancy between the circuit court's oral ruling on the summary judgment motions and its written order. The written order submitted by the parties indicates that judgment was entered in favor of Stanton on counts II and IV. However, the court's oral ruling did not address count II. Instead, the court stated, "the breach of contract claim

[wa]s gone" but "the fraud claim or claims live[d]." Count II, however, was not a breach-of-contract claim. It sought recission based on Blackhawk's reasonable, mistaken reliance on Stanton's alleged misrepresentations. It is not clear why the parties later submitted an order stating that judgment had been entered on count II. Nor is it clear why the parties have thereafter proceeded as if judgment had, in fact, been entered on count II.

¶ 68    While no specific mention of count II was made, we conclude the thrust of the court's oral ruling, which controls over the written order (see *In re Tr. O.*, 362 Ill. App. 3d 860, 868 (2005)), was that the court intended to enter judgment only on count IV of the amended complaint and did not intend to enter judgment on count II. This conclusion is logically consistent with the remainder of the order. Again, count II of the complaint sought recission of the contract based on its reasonable, mistaken reliance on certain representations of material fact. In effect, count II presented an alternative basis on which Blackhawk sought recission. In count II, Blackhawk alleged that, even if Stanton did not know his representations were false when he made them, they were mistakes of fact that justified recission. In other words, the factual questions that underlaid the fraud and mistake claims overlapped. And if the court found factual questions on the fraud claims required resolution and therefore summary judgment was improper, then it follows that factual questions precluded entry of judgment on the mistake claim.

¶ 69    Thus, we conclude we also lack jurisdiction to consider this appeal insofar as it concerns count II of the amended complaint for the same reasons we have found we lack jurisdiction to consider the parties' contentions as to counts I and III and Stanton's third affirmative defense. No judgment was entered on count II and that claim likewise remains pending in the circuit court.

¶ 70    In addition, we conclude we lack jurisdiction to consider Stanton's cross-appeal. In his cross-appeal, Stanton argues the circuit court erred by finding in Blackhawk's favor on his (1) first

affirmative defense (contractual limitations period) insofar as he asserted it barred counts I and III, and (2) second affirmative defense by finding paragraph 18(c) was only an integration clause and not also a no-reliance clause.

¶ 71    This court has long recognized that an order striking or dismissing an affirmative defense is not a final order and is not appealable even if the order is accompanied by a Rule 304(a) finding. In *Smith v. Interstate Fire & Casualty Co.*, 47 Ill. App. 3d 555, 558 (1977), we concluded that we did not have jurisdiction to review an order striking an affirmative defense. We reasoned that the striking of the affirmative defense did not end the controversy between the parties on the plaintiff's claim; rather, the circuit court still had before it a determination of whether the defendant was liable to the plaintiff. *Id.* In *Shelton v. Andres*, 122 Ill. App. 3d 1089, 1093 (1984), we likewise concluded that the circuit court's order striking the defendant's affirmative defenses was not final because it did not determine the litigation on the merits so that, if affirmed, the only thing remaining would be to proceed with execution of the order. We reiterated that the circuit court's entry of a Rule 304(a) finding cannot make final an otherwise nonfinal order. *Id.* Our supreme court has also recognized the nonfinal nature of an order denying an affirmative defense, reasoning that, while such a decision may remove one bar to a plaintiff's recovery, it is not a finding of liability with respect to the underlying claim and does not affect a defendant's ability to defend the underlying claim on the merits. *Mashal v. City of Chicago*, 2012 IL 112341, ¶¶ 55-58.

¶ 72    In his cross-appeal, Stanton seeks review of the circuit court's order denying his affirmative first and second defenses and asks us to reverse the court's determination that those defenses also barred counts I and III of Blackhawk's complaint. In light of the foregoing authority, however, those portions of the circuit court's order are nonfinal in nature. While those portions of the order may have resolved the issue of those affirmative defenses, the order did not resolve Stanton's

underlying liability on those counts such that, "if affirmed, the only task remaining for the trial court is to proceed with execution of the judgment." *Brentine*, 356 Ill. App. 3d at 765. Thus, we lack jurisdiction to consider Stanton's cross-appeal.

¶ 73    Here, the *only* claim on which the circuit court entered final judgment was count IV of the amended complaint. It did so on the basis that Stanton's first affirmative defense (contractual limitations period) barred Blackhawk's breach-of-contract claim. Indeed, the court's order finally disposed of the rights of the parties as to count IV of the amended complaint such that, "if affirmed, the only task remaining for the trial court is to proceed with execution of the judgment." *Id.* Thus, we will review only the parties' arguments as to whether the contractual limitations period barred count IV of the amended complaint.

¶ 74    Before addressing those arguments, we feel compelled to point out that both parties failed to address these readily apparent jurisdictional issues. Indeed, the fact that no final judgment had been entered on those claims is what necessitated the entry of the Rule 304(a) finding for either party to appeal from the otherwise interlocutory order. The entry of that written finding under Rule 304(a) should have alerted the parties that at least some portions of the court's order could not be challenged on appeal, but their cross-appeals nevertheless collectively challenged every aspect of the court's order. We reiterate the parties cannot by acquiescence confer jurisdiction on this court. *County Collector of Rock Island County v. Redco, Inc.*, 3 Ill. App. 3d 917, 919 (1972). And we remind the parties that the requirement that the parties provide this court with a statement establishing its jurisdiction (see Ill. S. Ct. R. 341(h)(4)(ii) (eff. October 1, 2020)) is "intended to provoke counsel to make an independent determination of the right to appeal before writing the brief." *Vowell v. Pedersen*, 315 Ill. App. 3d 665, 666 (2000). We emphasize that the parties should

give "more than lip service to the requirement," because, if not, they may end up spending significant time briefing issues that are not properly before this court. *Id.*

¶ 75    The parties here did not engage in such a determination. Indeed, Blackhawk's statement of jurisdiction states, in its entirety, "This appeal is brought pursuant to Illinois Supreme Court Rule 304(a)." This tells us little if not nothing about how we can properly exercise jurisdiction over this appeal and plainly fails to comply with Rule 341(h)(4)(ii). For his part, Stanton provided some analysis of how we had jurisdiction, asserting the notices of appeal were filed within 30 days of the court's order denying Blackhawk's motion to reconsider. Nevertheless, given our conclusion that we lack jurisdiction to consider most of the parties' contentions, what we warned about in *Vowell* has come to pass.

¶ 76    We dismiss Blackhawk's appeal insofar as it challenges the court's order concerning counts I, II, and III of its amended complaint and Stanton's third affirmative defense. We likewise dismiss Stanton's cross-appeal in its entirety. Simply stated, those aspects of the court's order were neither final nor appealable notwithstanding the court's entry of the written Rule 304(a) finding. See *Rosinski*, 2012 IL App (3d) 110942, ¶ 22.

¶ 77        C. Stanton's First Affirmative Defense: The Contractual Limitations Period

¶ 78    Blackhawk contends the circuit court erred by entering summary judgment in Stanton's favor on count IV of its amended complaint on the basis that those claims were barred by the limitations period contained in paragraph 9 of the contract. Specifically, Blackhawk argues the one-year limitations period applies only to claims that are based on the representations contained in paragraph 9(c) of the contract. Because its allegations of breach were based on duties imposed on Stanton pursuant to other paragraphs of the contract, it argues, the one-year limitations period did not apply to its claims. Rather, the claim was subject to the general 10-year limitations period

for actions based on a written instrument (735 ILCS 5/13-206 (West 2018)), and it filed suit in March 2018, well within the 10-year period. Blackhawk also asserts that, even if the one-year limitation period did apply, section 13-215 of the Code saves its claims because Stanton fraudulently concealed the causes of action and Blackhawk filed suit within five years after it discovered them.

¶ 79    Stanton argues the circuit court properly granted summary judgment in his favor on count IV because that claim is based on the representation in paragraph 9(c), *i.e.*, to his knowledge there was no default of any party under any of the leases that were assigned to Blackhawk. Because Blackhawk filed its initial complaint in March 2018, *i.e.* more than one year after closing, the claim was not timely. As to the issue of fraudulent concealment, Stanton does not argue section 13-215 cannot be applied when the parties have agreed to shorten the limitations period. Rather, he argues that, because Blackhawk's allegations of concealment are mere repetitions of its allegations of fraud, Blackhawk's claim of fraudulent concealment must fail. Further, he argues, section 13-215 merely tolls the statute of limitations and, because Blackhawk discovered its causes of action no later than April 2016, it should have brought suit within one year of that date, by April 2017.

¶ 80                              1. *Standard of Review*

¶ 81    Summary judgment is appropriate when "the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." 735 ILCS 5/2-1005(c) (West 2020)). We review *de novo* the grant of summary judgment. *Devyn Corp. v. City of Bloomington*, 2015 IL App (4th) 140819, ¶ 47. Our review is also *de novo* to the extent we are required to construe the contract (*Gallagher v. Lenart*, 226 Ill. 2d 208, 219 (2007)) and interpret section 13-215 of the Code (*Devyn Corp.*, 2015 IL App (4th) 140819, ¶ 47).

¶ 82                                    2. *The Contractual Limitations Period*

¶ 83    Paragraph 9 of the contract reads, in relevant part, as follows:

"9. Seller Representations and Warranties. [Stanton] makes the following

representations and warranties as of [November 21, 2013,] and again as of [January 16,

2014,] as follows (and all of which shall survive the Closing for a period of [12] months

(the [']Survival Period[']) and not be merged into the Deed):

***

(c) As of [November 21, 2013], the only Leases in effect with respect to the

Property are those leases described on the rent roll attached hereto as EXHIBIT C

and such rent roll is true and correct in all material respects. There is no default on

the part of [Stanton] as landlord under the Leases and the Leases are is [*sic*] in full

force and effect. To [Stanton's] knowledge, there is no default on the part of the

tenants under the Leases. [Stanton] has delivered a true and correct copies [*sic*] of

the Leases to [Blackhawk]."

¶ 84    The parties do not dispute that paragraph 9 operates as a limitations period and that the 12-

month period is reasonable and, therefore, valid. See *Medrano v. Production Engineering Co.*, 332

Ill. App. 3d 562, 566 (2002) (contractual limitations periods are valid if reasonable). And there is

no dispute that paragraph 9(c) does not operate as a total bar on any claim based on the

representation but, rather, operates to bar such a claim that is not brought within a year of the

closing, *i.e.*, by January 16, 2015.

¶ 85    Instead, the parties dispute whether Blackhawk's claims are based on Stanton's written

representation that, as of November 21, 2013, and January 16, 2014, no tenant had defaulted under

any of the leases that were ultimately assigned to Blackhawk. As noted, Blackhawk argues its

claims are based on other contractual obligations imposed on and representations made by Stanton and are therefore not subject to the limitations period. Stanton, on the other hand, argues *all* of the operative allegations of Blackhawk's complaint are based on the representation that EAT was not in default under the lease and therefore fit squarely within paragraph 9(c) and are, thus, barred by the one-year limitations period.

¶ 86    Because paragraph 9(c) operates only as a limitations period and not as a total bar on claims based on Stanton's representation that there was no default by any of his tenants at the time of closing, we need not decide whether Blackhawk's claims are based, in whole or in part, on that representation. Even if the claims are based on the representation contained in paragraph 9(c), we conclude the circuit court erred by finding section 13-215 was inapplicable as a matter of law. We further conclude, as Blackhawk argued in the circuit court, there exist material factual questions as to whether Stanton and the Di Pasquantonios engaged in a scheme to conceal Blackhawk's claims.

¶ 87                          3. *Section 13-215 of the Code*

¶ 88    Section 13-215 of the Code reads as follows:

> "If a person liable to an action fraudulently conceals the cause of such action from the knowledge of the person entitled thereto, the action may be commenced at any time within 5 years after the person entitled to bring the same discovers that he or she has such cause of action, and not afterwards." 735 ILCS 5/13-215 (West 2018).

Fraudulent concealment under section 13-215 " 'is not a cause of action in and of itself; rather, it acts as an exception to the time limitations imposed on other, underlying causes of action.' " *Wisniewski v. Diocese of Belleville*, 406 Ill. App. 3d 1119, 1154 (2011) (quoting *Cangemi v. Advocate South Suburban Hospital*, 364 Ill. App. 3d 446, 459 (2006)). Nor is section 13-215

merely a tolling provision. It contains a separate limitations period when a party liable to an action has fraudulently concealed the cause of action, providing that, in such cases, the party entitled to bring the action may do so at any time within five years after he or she discovers the cause of action. 735 ILCS 5/13-215 (West 2018); *Kheirkhahvash v. Baniassadi*, 407 Ill. App. 3d 171, 181 (2011).

¶ 89    Generally, when a party invokes section 13-215 of the Code, he or she must "show affirmative acts by the defendant which were designed to prevent, and in fact did prevent, discovery of the claim." *Foster v. Plaut*, 252 Ill. App. 3d 692, 699 (1993). The plaintiff "must plead and demonstrate that the defendant made misrepresentations or performed acts which were known to be false, with the intent to deceive the plaintiff, and upon which the plaintiff detrimentally relied." *Id.* Neither the mere silence of the defendant nor the mere failure of the plaintiff to discover the claim amount to fraudulent concealment. *Id.* Nor is it sufficient to show mere misconduct. *Id.* Rather, the plaintiff "must be able to show that the defendant said or did something to lull or induce the plaintiff to delay the filing of his [or her] claim after the limitations period has run." *Id.*

¶ 90    We first address the circuit court's determination that Blackhawk could not rely, as a matter of law, on section 13-215 the Code. On this point, the court found, "[w]hile that statute extends the *statutory* limitations period of any action five years, it does not affect the right of the parties to contract for a shorter limitations period." We reject this determination.

¶ 91    We note Stanton offers no argument in support of the circuit court's finding and instead offers other arguments as to why section 13-215 does not save the claims at issue. In any event, we see no basis in the statute for limiting its application only to statutory limitations periods. Indeed, the plain language of the statute places no such limit on its application. See *Whitaker v.*

*Wedbush Securities, Inc.*, 2020 IL 124792, ¶ 16 (court must apply statute as written and may not read in exceptions, limitations, or conditions that conflict with the statute's plain language). Moreover, "[s]tatutes which are in existence at the time a contract is executed are, in the absence of contrary language, deemed to be a part of the contract as if they were expressly incorporated therein." *Lincoln Towers Insurance Agency, Inc. v. Boozell*, 291 Ill. App. 3d 965, 969 (1997). Here, the parties agreed their respective rights were to be governed by Illinois law. And though the parties placed a one-year limit within which some claims were to be brought, they did not include any language in the contract disclaiming section 13-215 of the Code. Accordingly, we reject the court's determination that section 13-215 does not apply, as a matter of law, when the parties have agreed to shorten the statutory limitations period.

¶ 92     That said, we conclude there exist questions of fact that preclude a finding that Stanton fraudulently concealed the causes of action. Initially, Blackhawk has taken a different position on appeal than it did in the circuit court on this issue. In this court, Blackhawk seems to take the position, without expressly stating it, that there is no question Stanton fraudulently concealed the causes of action and, therefore, the one-year limitations period does not bar its claims. In the circuit court, however, Blackhawk conceded that there existed factual questions as to whether Stanton had fraudulently concealed the claims. Indeed, at the hearing on the summary judgment motions, counsel for Blackhawk argued that, if section 13-215 was applicable, then he "would agree there's a dispute as to that [*i.e.*, whether there was a scheme to conceal the fraud], and [Blackhawk] would probably not get summary judgment on that basis."

¶ 93     We agree with the position taken by Blackhawk in the circuit court. There exist disputes of material fact as to whether Stanton took an affirmative act or acts to lull Blackhawk into

delaying the filing of its complaint until more than one year after the closing had passed. Accordingly, the circuit court erred by entering judgment on count IV.

¶ 94    Blackhawk presented evidence that Stanton knowingly made false representations and engaged in conduct that tended to conceal the causes of action. See *Bruns v. City of Centralia*, 2014 IL 116998, ¶ 12 (nonmovant avoids summary judgment by presenting some evidence to support each element of his or her claim). Indeed, Blackhawk presented evidence that a contractor (Niedholt) was present for a conversation between Stanton and Robert, before closing, in November 2013, during which Robert told Stanton that he intended to close the Urban Grille, which accounted for a large portion of the building's rental income. In response, Stanton told Robert he had to keep operating because he was in the process of selling the property. In furtherance of that agreement, Stanton, before closing, (1) pursuant to paragraph 4 of the contract, delivered to Blackhawk income statements that showed EAT had paid all rent through the end of December 2013; (2) pursuant to paragraph 5 of the contract, delivered the estoppel certificate, in which EAT represented that it was current on rent through January 2014 and was "open for business and in operation"; (3) after being asked by Finley about the sign on the Urban Grille, advised Finley that the restaurant occasionally closed at certain times in January; and (4) pursuant to paragraph 7 of the contract, paid (in the form of a closing credit) to Blackhawk prorated rent he had received in January 2014, including rent he had purportedly received from EAT. During the same timeframe, Stanton received three checks from EAT, purportedly for rent, that he never attempted to deposit because, by his own admission, he knew EAT did not have sufficient funds in its account.

¶ 95    Blackhawk also presented evidence that the conduct to conceal Stanton's false representations continued after the closing. In the bankruptcy proceedings—which the

Di Pasquantonios commenced on August 25, 2014, less than five months before the expiration of the contractual-limitations period—the Di Pasquantonios maintained that EAT had paid all the rent it owed to Stanton and, as far as Stanton knew, intended to resume operations in February 2014. The Di Pasquantonios did not list Stanton as a creditor in the bankruptcy proceedings, despite the fact they delivered three checks (totaling $52,850) that were never deposited by Stanton, and nevertheless testified in their Rule 2004 examination that they had paid all rent. And they did not maintain EAT's business records, which were either lost or destroyed. Granted, this evidence relates only to what actions EAT and the Di Pasquantonios, as opposed to Stanton, took after closing. But a factfinder could reasonably conclude that the Di Pasquantonios' actions were taken pursuant to their agreement with Stanton.

¶ 96    Further, Blackhawk exercised diligence by reviewing financial statements before closing and inquiring further when it learned, just before the closing, the Urban Grille appeared to be closed. Indeed, in his deposition, Stanton admitted Blackhawk was as thorough a buyer as he had ever encountered. It was not until January 2016, when Blackhawk received EAT's bank records, that Blackhawk could confirm that the representations Stanton made and the documents he delivered may have been false. Indeed, those bank records—which showed (1) EAT did not actually pay rent in October 2013 (except in part), November 2013, December 2013, and January 2014, and (2) EAT's account had a steady stream of deposits and withdrawals throughout each of the previous three Januarys—contradicted the representations that Blackhawk was current on its rent and that EAT often closed in January.

¶ 97    On this point, we reject Stanton's argument that Blackhawk, through the exercise of ordinary diligence, should have discovered its claims within one year of the closing. He argues "the availability of the cause of action was plainly set forth at paragraph 10 of the contract," which

stated that Blackhawk had the right "to bring any action against [Stanton] as a result of any untruth or inaccuracy of representations and warranties made." He points to David's deposition testimony that he had read the agreement, knew paragraph 10 gave Blackhawk the right to bring a cause of action for misrepresentations, and that Blackhawk should be held to the contract's terms.

¶ 98    However, paragraph 10 also states that Blackhawk had the right to bring an action only if, prior to closing, it did not discover or learn information that contradicted Stanton's representations or rendered them untrue or incorrect. Stanton's argument assumes that Blackhawk learned or discovered the falsity of the representations before closing, but he offers no explanation as to how Blackhawk could have done so.

¶ 99    Stanton, for his part, denied that he ever had a conversation with Robert in which Robert stated his intent to close the Urban Grille or that he and Robert entered into an agreement to conceal this fact from Blackhawk. He likewise denied he knew that EAT intended to close, and his lack of knowledge was corroborated by Robert's testimony that (1) he did not decide to close the Urban Grille until January and (2) he never told Stanton that he did not intend to reopen.

¶ 100   Thus, we conclude disputes of material fact preclude a finding, on summary judgment, that Stanton fraudulently concealed the causes of action and that Blackhawk did not discover them until after the one-year limitation period expired. The circuit court erred by first finding the statute was not applicable and second by entering judgment in favor of Stanton on count IV.

¶ 101   In reaching this conclusion, we acknowledge that some of the evidence presented by Blackhawk, particularly Stanton's preclosing conduct, supports the claims themselves. As Stanton points out, generally, misrepresentations that form the basis of the cause of action cannot also constitute fraudulent concealment under section 13-215. See *Foster*, 252 Ill. App. 3d at 699. But, here, the preclosing misrepresentations also tended to conceal the claims. See *id.* And this

argument overlooks the evidence of the agreement to conceal the fraud, pursuant to which EAT took action to continue the concealment.

¶ 102   Stanton also argues that fraudulent concealment necessarily involves *only* actions to conceal that occurred *after* the cause of action accrues. According to Stanton, the cause of action accrued at closing, on January 16, 2014, and Blackhawk failed to present any evidence showing he took action after that date to conceal Blackhawk's claims.

¶ 103   We agree that a party may conceal a cause of action after it has accrued, but Stanton has offered no authority in support of his argument that any concealment *must* take place after the cause of action accrues. It is therefore forfeited. *Northwestern Memorial Hospital v. Sharif*, 2014 IL App (1st) 133008, ¶ 20. In any event, this case demonstrates that such conduct can occur before a cause of action accrues and continue for years after. Under such circumstances, we fail to see why a person invoking section 13-215 would not be entitled to the five-year limitation period in the statute. Further, as noted, EAT engaged in conduct after closing that prevented Blackhawk from discovering the claim, and a factfinder could reasonably infer that EAT did so in furtherance of its agreement with Stanton.

¶ 104   Finally, Stanton argues that, even if Blackhawk discovered its claim when at the Di Pasquantonios' Rule 2004 examination in April 2015 or when it received EAT's bank records in January 2016, Blackhawk was required to bring its claim within one-year of that discovery. In support, he relies on *Morris v. Margulis*, 197 Ill. 2d 28 (2001). In *Morris*, the court noted the general rule was that, if at the time the plaintiff discovers the cause of action a reasonable time remains within the applicable statute of limitations, section 13-215 does not toll the limitations period. *Id.* at 38 (citing *Anderson v. Wagner*, 79 Ill. 2d 295, 322 (1979)). The *Morris* court

explained the plaintiff had discovered the fraudulent concealment shortly after it occurred and, therefore, had almost two years under the applicable limitations period to bring his claim. *Id.*

¶ 105   Here, the contractual limitations period placed a hard time limit on when Blackhawk could bring a claim based on certain representations. It did not give Blackhawk 12 months from the date it discovered any such claim to bring the action. Rather, it required any such claim to be brought within 12 months after closing, *i.e.* no later than January 16, 2015. Blackhawk could not have and did not discover its cause of action until it received EAT's bank records during the bankruptcy proceedings, in January 2016. Up to that point, Blackhawk had exercised diligence and could not have discovered Stanton had misrepresented the status of EAT, his tenant responsible for the largest portion of his rental income from the property. Thus, when Blackhawk discovered its causes of action, the one-year limitation period had already expired, and there was *no time remaining* in the applicable limitations period. *Cf. Morris*, 197 Ill. 2d at 38. Under such circumstances, the plain language of section 13-215 dictates that "the action may be commenced at any time within 5 years *** and not afterwards." 735 ILCS 5/13-215 (West 2018). Here, Blackhawk filed its initial complaint in March 2018, which would be well within the five-year limitation period set forth in the statute, if the factfinder finds Stanton fraudulently concealed the actions. Accordingly, we reverse the circuit court's order granting summary judgment in favor of Stanton on count IV of the amended complaint and remand for further proceedings.

¶ 106                                III. CONCLUSION

¶ 107   For the reasons stated, we dismiss in part Blackhawk's appeal and dismiss Stanton's appeal in its entirety. Otherwise, we reverse the order of the circuit court of Kane County and remand for further proceedings.

¶ 108   Appeal dismissed in part; cross-appeal dismissed; reversed and remanded.